UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Jill H. Coffman, Regional Director of Region 20 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board,<br><br>Petitioner,<br><br>v.<br><br>UPS Supply Chain Solutions, Inc.,<br><br>Respondent. | No. 2:23-cv-02495-KJM-DB<br><br>ORDER |

The Regional Director of Region 20 of the National Labor Relations Board requests a temporary injunction against respondent UPS Supply Chain Solutions, Inc. under section 10(j) of the National Labor Relations Act. As explained in this order, the regional director has demonstrated she is entitled to relief under section 10(j), and the petition is **granted**.

I.     BACKGROUND

UPS has operated a secure drug distribution warehouse in Tracy, California since late 2019. N.L.R.B. Hr'g Tr. at 323.[1] The warehouse receives drugs from manufacturers and other distributors, then ships them to Kaiser Permanente facilities in California, Oregon and

---

[1] This transcript includes four volumes filed on the docket of this action at ECF No. 3-2 as exhibits G, H, I and J to the petition for an injunction.

1

1  Washington; Kaiser is its only customer. *Id.* at 312, 322–24. Because some of the drugs are
2  potentially dangerous, the Tracy facility must comply with state and national drug safety laws and
3  regulations, such as regulations confining drugs to secured and lockable areas, restricting entry to
4  only authorized personnel, and requiring certifications of compliance. *See id.* at 322–24; Opp'n
5  Inj. at 5–6, ECF No. 14 (citing Cal. Code Regs. tit. 16, § 1780 (2023)). The California Board of
6  Pharmacy and National Association Board of Pharmacy also randomly inspect and audit the
7  facility. N.L.R.B. Hr'g Tr. at 323–25, 431.

8      One of the disputes in this case centers on the badges employees wear and use to enter and
9  exit the warehouse. Employees have photo ID badges that interact with scanners at entrances and
10 exits, including at the entrance nearest the employee parking lot. *Id.* at 328–32. UPS also has a
11 contract with a security company to keep a guard near the employee entrance. *Id.* at 420–22. The
12 guard is stationed in a security "cage" with a desk near the entrance. *Id.*; Gen. Counsel Ex. 2.[2]
13 Guests also must have badges; they sign in with the security guard to receive a visitor badge and
14 must always be escorted inside the facility. N.L.R.B. Hr'g Tr. at 97, 193–94. Both employees
15 and guests must wear their badges conspicuously on their clothes. *See, e.g.*, Resp. Exs. 34–35.[3]

16     In March and April 2022, a UPS employee named Daniel Valadez Arce began speaking
17 with his coworkers about bringing a union to the Tracy facility. N.L.R.B. Hr'g Tr. 163–65. He
18 also asked a former coworker, Sal Lomeli, a Teamsters union secretary and treasurer, for advice
19 about how to organize the Tracy facility. *Id.* at 165. Lomeli gave Valadez union authorization
20 cards to pass out to coworkers, which he did later that same day, sitting on a bench outside the
21 employee entrance. *Id.* at 166–68. He obtained thirty-four signatures, well over half of the
22 roughly fifty employees at the Tracy facility. *See id.* at 58. An election was scheduled for the
23 afternoon of May 11, 2020. *See id.* at 59, 182.

24     UPS management soon learned what Valadez was doing. *See id.* at 166–68; Gen. Counsel
25 Ex. 23. A UPS supervisor also heard second-hand that Valadez had collected enough employee

---

[2] The "General Counsel's Exhibits" cited in this order are those reproduced in Exhibit K to the pending petition, filed at ECF Nos. 003-3 to 003-6.

[3] The "Respondent's Exhibits" cited in this order are those reproduced in Exhibit M to the pending petition, filed at ECF No. 003-6 to 003-8.

signatures to qualify for an election conducted by the N.L.R.B.  N.L.R.B. Hr'g Tr. at 712–13; Gen. Counsel Exs. 21, 23.  Management prepared a "First Warning Sign Notification" about Valadez, Gen. Counsel Ex. 16, and UPS soon began organizing a responsive campaign urging employees not to vote in support of the union, Gen. Counsel Ex. 23.  Within about a week, UPS had engaged consultants, including Simon Jara, who came to the Tracy facility to give company-sponsored presentations to employees about unions and collective bargaining.  *See* Gen. Counsel Ex. 18; N.L.R.B. Hr'g Tr. at 494–95.  UPS allowed Jara to roam the Tracy facility during the workday to talk to employees.  *See* N.L.R.B. Hr'g Tr. at 556–58.

Two days before the election, a UPS manager gave a presentation at an employee meeting.  *See* Gen. Counsel Ex. 15; N.L.R.B. Hr'g Tr. at 182–83, 485.  He implied that if employees were represented by a union, they would lose their jobs.  His statements are best understood with some context:

> [T]here is no doubt in my mind that operating in a non-union environment is the better path.  Not only is it better for our business but I my opinion [sic] it is better for our employees and better for our customer.
>
> . . . We only hope you give us the chance to address these issues, without the interference of a third party.  You don't need that, and neither does our Healthcare customer.
>
> . . . As we have said throughout the union campaign, we do not believe a third party is necessary to intervene in our business.  We do not believe it is in the best interest of you the employee, UPS or our Customer: Our client made a decision 4 years ago to move to the distribution of their product from a unionized facility to UPS.  We communicated the fact our operations here were non-union during the sales process.  I'm not saying that would happen here, I'm just saying that this is a factor our customers and potential customers consider.
>
> . . .
>
> The union claims they can give you job security.  But our job security comes from satisfying our One Healthcare customer.  In the end, if we don't meet customers [sic] service commitments, they all have language in their contracts to provide notification to UPS of their intent to exit the agreement.  It's called an escape clause.

3

> The Teamsters can't guarantee to keep the company healthy.
>
> They can't guarantee to create jobs.
>
> They can't guarantee we will get new customers.
>
> And they can't guarantee there would never be layoffs. . . .
>
> Our customers entrust us with their Healthcare products because we have assured them, we can deliver order-accuracy, service and quality at an agreed upon price. If they lose their confidence in our ability to get product to them, complete and on-time, we face the possibility of losing the business—and you know what that means to job security.
>
> . . .
>
> Unfortunately, no matter what the union says, a strike is always a possibility with the union. It is the only bargaining leverage they have. Strikes create uncertainty for our customers and as we noted, they have options.

Gen. Counsel Ex. 15 at 1–7.

The union election was held in the employee break room, which is just past the security desk at the employee entrance. *See* N.L.R.B. Hr'g Tr. 60–66; Gen. Counsel Ex. 2. About half an hour before the election began, representatives from both management and the Teamsters were in the room, including Lomeli, the man who had spoken to Valadez before. N.L.R.B. Hr'g Tr. 67, 382–84, 664. He was standing in a group with Valadez and another Teamsters representative, Ed Speckman. *Id.* at 69–70. Lomeli suddenly realized he had lost his wallet with his ID. *Id.* 70. He told Valadez. *Id.* Lomeli had a visitor's badge, but both men were unsure whether that badge would open the exterior door if Lomeli went outside. *Id.* at 72, 194. Valadez offered Lomeli his badge to borrow while he looked for his wallet and told Lomeli to hurry back. *Id.* at 202–03. All of this was in plain view. *Id.* at 202–04.

Jara—the consultant UPS had hired to give presentations to employees urging them not to unionize—followed Lomeli out of the breakroom. Gen. Counsel Ex. 12. Jara noticed Valadez's badge. N.L.R.B. Hr'g Tr. at 78–79. He told Lomeli it was "illegal" to borrow a badge. *Id.* Jara told a UPS representative, who spoke to Valadez. Valadez explained he gave his security badge

to Lomeli and offered to retrieve his badge. Gen. Counsel Ex. 12; N.L.R.B. Hr'g Tr. 204–05, 215–16, 391–92. In the end, Lomeli found his wallet and returned Valadez's badge without incident. N.L.R.B. Hr'g Tr. 81–82, 212–15. Lomeli remembers the security guard said it was okay but not to let it happen again. *Id.* at 81–82, 88–89, 215–16. Video from security cameras nearby show Lomeli was never outside the view of employees or management in the building during the time he borrowed the badge; he appears to have been alone briefly, but only outside the building. *See* Gen. Counsel. Ex. 12.

Employees voted 22 to 17 in favor of joining the union. That night, management had a conference call to talk about Valadez and his badge. *See* N.L.R.B. Hr'g Tr5. 436. UPS's human resources director decided to suspend him, and he was terminated a week later. *Id.* at 223–24, 630–32, 642. This meant his last day of work—and the last day his coworkers saw him at work—was the day of the election. UPS had never disciplined any other employee for any offense related to badges, and it had only ever terminated employees for missing work. *See id.* at 133–34, 424; Gen. Counsel Ex. 5.

Valadez was the most senior employee on his shift. N.L.R.B. Hr'g Tr. at 223–27. He had worked at the Tracy facility since it opened, he had been promoted, he had trained new employees, he had received greater pay raises than average, and before his termination, he had maintained a spotless record. *Id.* For these reasons, according to the N.L.R.B., he was an "ideal organizer." Mem. Inj. at 10, ECF No. 3. He also had been the union's primary means of communicating with employees at the Tracy facility, both before and after the election. Speckman Decl., Pet. Ex. N, ECF No. 3-8.[4] The union has had difficulty maintaining contact with employees in the Tracy facility since Valadez's termination. *Id.* at 2–3. A union representative believes employees at the Tracy facility "feel that [UPS] has already won and this has dampened support for the Union." *Id.* at 3.

---

[4] The court overrules UPS's late-filed evidentiary objections to this declaration. *See generally* Objs., ECF No. 20. Federal courts commonly consider affidavits and other similar evidence when deciding whether to grant preliminary or temporary injunctive relief, even if that evidence does not comply strictly with the Federal Rules of Evidence. *See, e.g., Coffman v. Queen of Valley Med. Ctr.*, 895 F.3d 717, 729 (9th Cir. 2018); *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013).

Jill Coffman, the Regional Director of Region 20 of the National Labor Relations Board, filed administrative complaints against UPS in two consolidated cases in May 2023. *See* Am. Consol. Compl. & Not., Pet. Ex. A, ECF No. 3-2. The complaints alleged UPS engaged in unfair labor practices by cautioning employees about losing Kaiser's business and by terminating Valadez. *See generally id.* The complaints relied on sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act. Section 8(a)(1) prohibits employers from interfering with, restraining or coercing employees in the exercise of rights guaranteed by section 7, i.e., "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection," among other rights. 29 U.S.C. §§ 157, 158(a)(1). Section 8(a)(3) generally prohibits employers from discriminating "in regard to the hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." *Id.* § 158(a)(3). Coffman alleges Valadez's termination violated both sections 8(a)(1) and 8(a)(3), and she alleges the management representative's speech to employees about Kaiser's continuing relationship with UPS violated section 8(a)(1). The parties litigated these claims in an administrative proceeding before an administrative law judge between May 9 and 12, 2023. *See generally* N.L.R.B. Hr'g Tr. The administrative law judge has not yet made a decision.

Coffman filed this action under section 10(j) of the National Labor Relations Act. Section 10(j) allows the N.L.R.B. to seek temporary injunctive relief in federal court while an administrative process is pending. *See* 29 U.S.C. § 160(j). Coffman seeks a temporary injunction and asks the court to make its final decision based on the administrative record and the declaration submitted with her motion. *See generally* Pet., ECF No. 1; Mem. Inj., ECF No. 3; Mot. Trial on Record, ECF No. 2; Mem. Trial on Record, ECF No. 10. Among other forms of relief, Coffman moves for an order directing UPS to comply with the law, reinstate Valadez, and provide copies of this court's order to UPS employees. *See* Pet. at 7–10. UPS opposes both motions, which are fully briefed. *See generally* Opp'n Inj., ECF No. 14; Opp'n Trial on Record, ECF No. 15; Reply Inj., ECF No. 18; Reply Trial on Record, ECF No. 17. The court held a

hearing on December 1, 2023.  Mins., ECF No. 22.  Cecily Vix appeared for Coffman, with Jennifer Benesis observing.  Elizabeth Falcone and Elizabeth Barankin appeared for UPS.

## II.   LEGAL STANDARDS

A district court has jurisdiction to grant temporary injunctive relief under section 10(j) "as it deems just and proper."  29 U.S.C. § 160(j).  To decide whether a temporary injunction is "just and proper," the court consults the same four "traditional equitable criteria" that it would rely on in response to a motion for a preliminary injunction under Federal Rule of Civil Procedure 65.  *Frankl v. HTH Corp.* (*Frankl I*), 650 F.3d 1334, 1355 (9th Cir. 2011) (quoting *McDermott v. Ampersand Publ'g, LLC*, 593 F.3d 950, 957 (9th Cir. 2010)).  That is, the petitioning regional director must show she is "likely to succeed on the merits" in the underlying administrative process, irreparable harm is likely in the absence of injunctive relief, the balance of equities favors an injunction, and "an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).  When district courts employ these criteria, they "must 'keep in mind that the underlying purpose of § 10(j) is to protect the integrity of the collective bargaining process and to preserve the N.L.R.B.'s remedial power while it processes the charge.'"  *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1187 (9th Cir. 2011) (alterations omitted) (quoting *McDermott*, 593 F.3d at 957).  The district court may consider affidavits and other "hearsay" materials that might be inadmissible under the Federal Rules of Evidence.  *Coffman*, 895 F.3d at 729 (quoting *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)).

## III.   DISCUSSION

### A.   Motion for a Trial on the Written Record

At the outset, the regional director asks the court to make its decision on the written record without an evidentiary hearing or discovery.  UPS opposes this request.  The court grants the request as explained here.  In a proceeding under section 10(j), a district court decides only whether the petitioner is entitled to preliminary relief based on traditional equitable principles, not whether the respondent probably violated the law.  *See Frankl I*, 650 F.3d at 1355.  District courts commonly make this decision based only on a written record, as they commonly do in connection with preliminary injunction motions under Rule 65.  *See, e.g.*, *Overstreet v. NP Red Rock, LLC*,

1  No. 20-02351, 2021 WL 3064120, at *1 n.1 (D. Nev. July 20, 2021), *aff'd*, No. 21-16220, 2021
2  WL 5542167 (9th Cir. Nov. 26, 2021) (unpublished); *Garcia v. Sacramento Coca-Cola Bottling*
3  *Co.*, 733 F. Supp. 2d 1201, 1204 n.1 (E.D. Cal. 2010).  As explained in the separate subsections
4  below, the regional director has shown she is entitled to relief based on the written record.  No
5  discovery or evidentiary proceedings are necessary.

6  UPS argues that without an evidentiary hearing, it cannot fully respond to the regional
7  director's evidence of irreparable harm.  *See* Opp'n Trial on the Record at 4–5.  The court
8  disagrees; just as the regional director may submit evidence in support of its motion, UPS may
9  submit evidence in opposition.  *See* E.D. Cal. L.R. 142, 230(h).  And with two exceptions, UPS
10 has not explained what evidence is missing from the written record.  First, UPS asks for an
11 opportunity to cross-examine Speckman, whose affidavit the regional director cites.  *See* Opp'n
12 Trial on the Record at 5–6.  UPS does not explain, however, what it hopes to achieve during the
13 hearing that it could not achieve by citing the written record or making arguments in a legal
14 memorandum.  The Ninth Circuit also has confirmed that district courts may grant relief under
15 section 10(j) despite conflicts in the evidence, *see, e.g.*, *Scott ex rel. N.L.R.B. v. Stephen Dunn &*
16 *Assocs.*, 241 F.3d 652, 662 (9th Cir. 2001), *abrogated on other grounds as recognized by*
17 *Frankl I*, 650 F.3d at 1355, so cross-examination is unlikely to be pivotal.  Second, UPS argues
18 the administrative law judge improperly excluded some evidence as inadmissible, and it contends
19 this court must hold an evidentiary hearing to consider that excluded evidence.  *See* Opp'n Trial
20 on the Record at 6.  The court declines that invitation.  UPS has not explained why an evidentiary
21 hearing is necessary to air that evidence; it has cited some of the excluded evidence in its written
22 opposition.  *See, e.g.*, Opp'n Inj. at 12 & n.10.  This court also hesitates to wade into the
23 administrative law judge's evidentiary rulings; UPS may seek relief from a court with appellate
24 jurisdiction over the administrative law judge's decisions at an appropriate time.

25 UPS argues similarly that the court should not grant the regional director's motion before
26 discovery.  *See* Opp'n Trial on the Record at 6.  It cites no binding authority requiring discovery,
27 and district courts commonly deny requests for discovery related to petitions for relief under
28 section 10(j), including courts within the Ninth Circuit.  *See* Reply Trial on the Record at 8–9

1  (collecting authority).  The court denies UPS's request for discovery.  UPS "provides no basis for
2  seeking discovery" and "does not state what discovery it seeks."  *Garcia ex rel. N.L.R.B. v.*
3  *Fallbrook Hosp. Corp.*, 952 F. Supp. 2d 937, 956 (S.D. Cal. 2013) (denying discovery request for
4  this reason).

5  For these reasons, the court grants the regional director's request for a final decision on
6  her 10(j) petition without discovery and without an evidentiary hearing.  The court now turns to
7  the four traditional equitable considerations that govern motions for preliminary injunctive relief,
8  beginning with the likelihood of success on the merits.

### B. Likelihood of Success on the Merits

A district court's evaluation of the petitioner's likelihood of success under section 10(j) is abstracted from the underlying dispute.  District courts do not have jurisdiction over disputes about unfair labor practices; nor do they have jurisdiction to review the N.L.R.B.'s decisions about whether a particular employer has violated the National Labor Relations Act.  *See Frankl I*, 650 F.3d at 1355–56.  So rather than assessing the merits directly, the district court assesses "the probability that the [N.L.R.B.] will issue an order determining that the unfair labor practices alleged by the Regional Director occurred" and whether the Ninth Circuit would grant a petition enforcing the N.L.R.B. order.  *Id.* at 1355.  The court of appeals would then defer to the N.L.R.B.'s determinations in the later proceeding, and a district court should keep that deference in mind.  *See Miller for & on Behalf of N.L.R.B. v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 460 (9th Cir. 1994) (en banc), *abrogated in part on other grounds by Winter*, 555 U.S. 7, *as noted in Small v. Operative Plasterers' and Cement Masons' Int'l Ass'n, Local 200*, 611 F.3d 483, 491 (9th Cir. 2010).

These abstractions from the merits translate into a few practical rules.  To begin, the regional director need not show the respondent likely violated the National Labor Relations Act.  She instead can show a likelihood of success on the merits "by producing some evidence to support the unfair labor practice charge, together with an arguable legal theory."  *Frankl I*, 650 F.3d at 1355 (quoting *Miller*, 19 F.3d at 460).  The regional director "need only show a better than a negligible chance of success."  *Scott*, 241 F.3d at 662 (quotation marks and citations

omitted). And for that reason, "[a] conflict in the evidence does not preclude the Regional Director from making the requisite showing for a section 10(j) injunction." *Id.*

As summarized above, the regional director's administrative complaint alleges UPS violated two provisions of section 8(a) and did so in two different ways.

### 1. Violation of Section 8(a)(1): Management Speech

First, the regional director alleges UPS violated section 8(a)(1) when a member of UPS management told employees they might lose their jobs if they voted to join the Teamsters union. *See* Mot. Inj. at 23–24. The Supreme Court's foundational decision in *N.L.R.B. v. Gissel Packing Co.*, 395 U.S. 575 (1969), offers the regional director a path to success on that claim. *Gissel* was a consolidated appeal about several different labor disputes. One dispute was about a management speech to employees after a Teamsters union drive. *See id.* at 587–88. The company's president attempted to dissuade employees from joining the union by emphasizing a previous three-month strike that in his words "almost put our company out of business." *Id.* He "expressed worry that the employees were forgetting the lessons of the past." *Id.* at 588 (quotation marks omitted). He said the company "was still on thin ice financially, that the Union's only weapon is a strike, and that a strike could lead to the closing of the plant, since the parent company had ample manufacturing facilities elsewhere." *Id.* (quotation marks omitted). Finally, he "noted" that because of the employees' ages and "limited usefulness of their skills," they "might not be able to find re-employment if they lost their jobs as a result of a strike." *Id.* He later sent employees similar messages in pamphlets and letters. *Id.* at 588–89.

The N.L.R.B. decided these statements violated section 8(a)(1) by conveying a veiled threat. *See id.* at 589. The First Circuit agreed, as did the Supreme Court. *See id.* at 589–90, 616–20. "[A]n employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union," the Supreme Court explained, "so long as the communications do not contain a threat of reprisal or force or promise of benefit." *Id.* at 618 (quotation marks omitted). An employer "may even make a prediction as to the precise effects he believes the unionization will have on the company." *Id.* But "the prediction must be carefully phrased on the basis of objective fact." *Id.* Conveying a sincere belief "that

10

1    unionization will or may result in the closing of the plant is not a statement of fact unless, which
2    is most improbable, the eventuality of closing is capable of proof." *Id.* (quoting *N.L.R.B. v. The*
3    *Sinclair Co.*, 397 F.2d 157, 160 (1st Cir. 1968)).

4    The company president's statements ran afoul of that rule in *Gissel*. It was reasonable for
5    the N.L.R.B. to conclude "that the intended and understood import of [the president's statements]
6    was not to predict that unionization would inevitably cause the plant to close but to threaten to
7    throw employees out of work regardless of the economic realities." *Id.* at 619. The employer
8    "had no support for its basic assumption that the union, which had not yet even presented any
9    demands, would have to strike to be heard," and "admitted at hearing that it had no basis for
10   attributing other plant closings in the area to unionism." *Id.* The N.L.R.B. had "often found that
11   employees, who are particularly sensitive to rumors of plant closings, take such hints as coercive
12   threats rather than honest forecasts." *Id.* at 619–20 (footnotes omitted). The N.L.R.B. has relied
13   on similar reasoning since *Gissel* was decided. *See, e.g.*, *In Re Daikichi Corp.*, 335 NLRB 622,
14   624 (2001) (analyzing a similar case and collecting authority).

15   Here, the regional director has demonstrated how the administrative law judge could
16   likely reach a similar conclusion in this case. A member of UPS management told employees a
17   union was "not in the best interest" of "our Customer"—the Tracy facility's one and only
18   customer—Kaiser. Gen. Counsel Ex. 15 at 4. He said Kaiser did not need "interference of a third
19   party." *Id.* at 3. He reminded employees Kaiser "made a decision 4 years ago to move the
20   distribution of their product from a unionized facility to UPS" after UPS "communicated the fact
21   our operations here were non-union during the sales process." *Id.* at 4. He said strikes were a
22   union's "only bargaining leverage" and would "create uncertainty" for Kaiser, but offered no
23   other evidence or information to suggest strikes were likely. *Id.* at 5. He warned if Kaiser lost
24   confidence in UPS, then UPS would lose Kaiser's business, "and you know what that means to
25   job security." *Id.* He told employees the union could not offer job security and could not get new
26   customers. *Id.* at 4–5.

27   As in *Gissel*, with these statements, it would be reasonable—probable, in fact—for the
28   N.L.R.B. to conclude the speech was a threat: management suggested neither UPS nor Kaiser

11

would tolerate a union, and it warned the union could not protect employees' jobs. In short, the regional director has produced "some evidence to support the unfair labor practice charge," i.e., the management speech, "together with an arguable legal theory," i.e., the theory behind *Gissel* and similar cases, *Frankl I*, 650 F.3d at 1355 (quoting *Miller*, 19 F.3d at 460), and "better than a negligible chance of success," *Scott*, 241 F.3d at 662 (citation omitted).

UPS cites the N.L.R.B.'s decision in *TNT Logistics North America* to urge the opposite conclusion. *See* Opp'n Inj. at 20 (citing 345 NLRB 290 (2005)). That decision does not undermine the regional director's showing of a likelihood of success on the merits. In *TNT Logistics*, a member of management told employees if they joined a union, the company could probably not make deliveries for its one client, Home Depot. *See id.* at *1–2. But unlike this case, there was no question that Home Depot did not "like using unionized carriers" and did not use "any" unionized carriers, and the company's contract with Home Depot was about to expire. *Id.* at *2. "Although there was no certainty that Home Depot would not renew its contract" if employees voted to unionize, the "unrefuted facts furnished an ample basis for a reasonable prediction that Home Depot would so act." *Id.* The employer also clarified the very next day it was "not certain that Home Depot would terminate its relationship" and "Home Depot's actions were entirely outside the Employer's control." *Id.* at *3. UPS has not cited similar undisputed evidence about Kaiser's policies. Nor has it cited evidence to show employees understood the decision was entirely within Kaiser's control. At most UPS's argument presents a conflicting interpretation of the management presentation. That conflict "does not preclude the Regional Director from making the requisite showing for a section 10(j) injunction." *Scott*, 241 F.3d at 662.

### 2. Violation of Section 8(a)(1) and 8(a)(3): Valadez's Termination

The regional director's second claim in her administrative complaint—and the second basis for her current motion—is that UPS violated sections 8(a)(1) and 8(a)(3) by firing Valadez soon after the successful union vote. *See* Mot. Inj. at 24–29. Among other claims, the regional director argues Valadez's security breach—lending his badge to a non-employee—was a pretext UPS would not have relied upon if Valadez had not engaged in union activities. *See id.* at 26–29.

12

"The National Labor Relations Act . . . makes unlawful the discharge of a worker because of union activity, but employers retain the right to discharge workers for any number of other reasons unrelated to the employee's union activities." *N.L.R.B. v. Transp. Mgmt. Corp.*, 462 U.S. 393, 394 (1983), *abrogated in part on other grounds by Dir., Off. of Workers' Comp. Programs, Dep't of Lab. v. Greenwich Collieries*, 512 U.S. 267 (1994) (citations omitted). When an employer contends it would have fired an employee in any event, citing reasons unrelated to the employee's union activities as UPS does in this case, the N.L.R.B. uses a burden-shifting process it first adopted in a case called *Wright Line*. *See id.* (citing 251 N.L.R.B. 1081 (1980), *enforced*, 662 F.2d 899 (1st Cir. 1981). As the Ninth Circuit has described this test, the regional director must first show "the employee was engaged in protected activity, the employer knew of such activity, and the employer harbored anti-union animus." *Coffman*, 895 F.3d at 729 (quoting *Frankl ex rel. N.L.R.B. v. HTH Corp.* (*Frankl II*), 693 F.3d 1051, 1062 (9th Cir. 2012)); *see also, e.g.*, *Cast-Matic Corp.*, 350 N.L.R.B. 1270, 1274 (2007). The burden then shifts to the employer "to demonstrate that it would have taken the same action regardless of the employee's union activity." *Coffman*, 895 F.3d at 729 (quoting *Frankl II*, 693 F.3d at 1062). "[A]n employer cannot overcome this burden 'where its asserted reasons for a discharge are found to be pretextual.'" *Id.* (quoting *United Nurses Ass'ns of Cal. v. N.L.R.B.*, 871 F.3d 767, 779 (9th Cir. 2017)).

The regional director has cited evidence that strongly supports a theory of liability under *Wright Line*. Valadez was the UPS employee most closely connected with the union drive. He was the organizer and primary connection between the employees and union. UPS tied Valadez to the unionization effort from the start. Valadez also attended the election in person, sitting and standing beside a union representative. This evidence shows Valadez was engaged in protected activity and UPS knew about it. The director also has cited evidence to show UPS harbored an anti-union animus, such as the speech by UPS management, described above, and Valadez's remarkably rapid suspension and termination after the successful union election. Timing such as this can be compelling. *See Healthcare Emps. Union, Loc. 399, Affiliated with Serv. Emps. Int'l Union, AFL-CIO v. N.L.R.B.*, 463 F.3d 909, 920–21 (9th Cir. 2006) (collecting authority).

Under *Wright Line*, the burden would shift to UPS to show it would have suspended and fired Valadez regardless of his union activity. *See Coffman*, 895 F.3d at 729. UPS argues it did not fire Valadez because of his union activity, but rather because he gave his badge to Lomeli. Opp'n Inj. at 23. UPS also argues it would have terminated Valadez regardless of his efforts to organize a union because he put the security of UPS's Tracy facility at risk. *See id.* at 22–24.

The regional director has cited evidence that could likely show the security breach was a pretext, which would prevent UPS from carrying its burden. For example, Valadez had never been disciplined, he had been promoted, and he had been entrusted with the training of new employees. UPS has cited no evidence to show it has suspended or terminated any other employee for problems related to security badges. It is also hard to see why Valadez's actions were any cause for concern. Valadez lent Lomeli his badge in full view of management personnel, Lomeli already had a visitor's badge, nothing suggests Lomeli went anywhere near the pharmaceuticals in the UPS facility or misused Valadez's badge, and the security guard appeared not to be concerned, at least not until UPS's labor consultant said something.[5] UPS also had allowed the same labor consultant—who, like Lomeli, was an outsider and not an employee—free reign of its Tracy facility. This is not to say security is unimportant. As UPS hammers home in its opposition, it must comply with laws and regulations that demand security. But it cites no evidence to show it was likely to lose a license or fail an inspection as a result of Valadez's actions. Nor could it cite that evidence when pressed at hearing. UPS agrees it was not required to self-report the violation. Nor does UPS dispute the regional director's claim that the California Board of Pharmacy has not disciplined any similar third-party logistics providers for security infractions in the last five years.

In sum, the regional director has shown a likelihood of success on the merits of her claims under sections 8(a)(1) and 8(a)(3). The court need not and does not consider the regional

---

[5] The security guard later denied he said it was "okay" for Lomeli to borrow the badge. N.L.R.B. Hr'g Tr. at 395. But the guard's testimony does not otherwise contradict Valadez's and Lomeli's account. Nor does it show the guard was concerned about a security problem; he let both men back into the building. *See id.* at 395–404. Again, this potential conflict in the evidence does not preclude the director from showing she is entitled to relief under section 10(j).

director's arguments about Valadez's terminations for participation in union activity.  *See* Mot. Inj. at 25–26.

### C. Irreparable Harm, the Balance of Hardships, and the Public Interest

The regional director also has shown irreparable harm is likely absent temporary injunctive relief.  "[T]he discharge of active and open union supporters" like Valadez "risks a serious adverse impact on employee interest in unionization and can create irreparable harm to the collective bargaining process." *Frankl I*, 650 F.3d at 1362 (quoting *Pye v. Excel Case Ready*, 238 F.3d 69, 74 (1st Cir. 2001)).  "[A] district court may not presume irreparable injury with regard to likely unfair labor practices generally," but "irreparable injury is established if a likely unfair labor practice is shown along with a present or impending deleterious effect of the likely unfair labor practice that would likely not be cured by later relief." *Hooks v. Nexstar Broadcasting, Inc.*, 54 F.4th 1101, 1115 (9th Cir. 2022) (quoting *Frankl I*, 650 F.3d at 1362).  A district court may permissibly infer irreparable harm from "the same evidence the Regional Director used to demonstrate a likelihood of success on the merits." *Id.* at 1117.  But it remains the regional director's burden to demonstrate "likely irreparable harm, and the district court must make a finding of irreparable harm that is based on evidence in the record." *Id.*

By firing Valadez immediately after the successful election, UPS suggested to other employees that union advocacy put them at risk of similar consequences.  The termination thus reinforced management's warning that employees could lose their jobs if they voted to join the union.  "[F]ear of employer retaliation after the firing of union supporters is exactly the 'irreparable harm' contemplated by § 10(j)." *Frankl I*, 650 F.3d at 1362 (quoting *Pye*, 238 F.3d at 74).  And as Speckman explains in his affidavit, the union has struggled to engage with UPS employees in the months since Valadez's termination.  By firing Valadez, UPS severed a crucial link between its employees and the union.  The passage of time has not mitigated these consequences.  Whereas once more than thirty employees signed authorization cards and twenty-two voted to join the union, only three remain in contact with the union at all.  An order temporarily reinstating Valadez would help reconnect the union with UPS employees and would confirm UPS cannot retaliate against workers for exercising their rights under the National Labor

Relations Act while the N.L.R.B. finalizes its decision. Finally, an order reinstating Valadez temporarily also would permit him to help represent employees in collective bargaining between the union and UPS if negotiations begin before the N.L.R.B. makes a final decision in the pending administrative process.

The balance of hardships also favors temporary injunctive relief. UPS faces little or no hardship from an interim reinstatement. It would regain the work of a valuable and experienced employee, and Valadez's reemployment would reduce the size of any future award of backpay. Nothing in the record suggests Valadez will cause a security risk. He never did before, and the director has demonstrated the security risk he created by lending his badge to Lomeli likely was trivial at best. Nor does the evidence show UPS will likely lose any licenses or fail any inspections. The other forms of relief the regional director requests—such as reminders to employees of their rights and publication of this court's decision—would reinforce laws UPS must already follow and would require little time or effort. The irreparable harm described above outweighs these minimal hardships.

Contrary to UPS's opposition, the regional director need not show the balance of hardships tips "sharply" in favor of an injunction. *See* Opp'n Inj. at 18 (citing *Frankl I*, 650 F.3d at 1355). That is only true when the regional director has raised only "serious questions." *See Frankl I*, 650 F.3d at 1355. By contrast, when the regional director has demonstrated a likelihood of success on the merits, as she has in this case, it is necessary only to show the hardships favor the requested injunction. *See id.* She has done so, as explained above.

Nor has the regional director undermined her claim of irreparable harm by delaying this petition unnecessarily. As her counsel clarified at hearing, the N.L.R.B. authorized this petition after considering the propriety of seeking relief under section 10(j) with its general counsel's office. That was a weighty decision, which took time, as the N.L.R.B. believes relief under section 10(j) is an extraordinary remedy and only seeks that relief rarely. Counsel for the regional director informed the court at hearing that in 2023, of the 700-plus complaints adjudicated, only 14 petitions were filed under section 10(j). The regional director filed her petition a few days after receiving authorization. The court cannot infer any undue delay.

Finally, "[i]n § 10(j) cases, the public interest is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge." *Id.* at 1365 (quoting *Miller*, 19 F.3d at 460). "Ordinarily when, as here, the Director makes a strong showing of likelihood of success and of likelihood of irreparable harm, the Director will have established that preliminary relief is in the public interest." *Small*, 661 F.3d at 1197 (alteration omitted) (quoting *Frankl I*, 650 F.3d at 1365). "[T]he public interest favors applying federal law correctly." *Id.* A temporary injunction is for these reasons in the public interest.

The regional director thus has satisfied each of the four criteria for a temporary injunction under section 10(j).

## IV.  CONCLUSION

The petition is **granted**. Pending the final disposition of the matters now pending before the National Labor Relations Board, respondent UPS Supply Chain Solutions, Inc., its officers, representatives, supervisors, agents, servants, employees, attorneys, and all persons acting on its behalf or in participation with it be, and they hereby are, enjoined and restrained from:

(a) Disciplining or discharging its employees for engaging in union and/or protected concerted activities;

(b) Threatening employees with a possible loss of work because they engaged in union activities; and

(c) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed under Section 7 of the Act.

In addition, pending the final disposition of the matters addressed by this order now pending before the National Labor Relations Board, respondent, its officers, representatives, supervisors, agents, servants, employees, attorneys, and all persons acting on its behalf or in participation with it shall take the following affirmative steps:

(a) **Within five days** of the court's order, offer, in writing, reinstate Daniel Valadez Arce to his former position, or if that position no longer exists, to a substantially equivalent position without prejudice to seniority or any other rights and privileges

|   |   |   |   |
|---|---|---|---|
| 1 |   |   | previously enjoyed, displacing, if necessary, any employee who may have been |
| 2 |   |   | hired or reassigned to replace him; |
| 3 | (b) |   | **Immediately** rescind, on an interim basis, the unlawful suspension and discharge |
| 4 |   |   | issued to Daniel Valadez Arce, and refrain from relying on those unlawful actions |
| 5 |   |   | in assessing any future discipline pending Board adjudication; |
| 6 | (c) |   | **Within seven days** from the date this order is filed: |
| 7 |   | (i) | Post physical copies of the court's order setting forth the relief granted, in |
| 8 |   |   | English and in other languages as necessary to ensure effective |
| 9 |   |   | communication to respondent's employees as determined by the Board's |
| 10 |   |   | Regional Director of Region 20, said translations to be provided by |
| 11 |   |   | Respondent at Respondent's expense and approved by the Regional |
| 12 |   |   | Director, at Respondent's Tracy, California facility on the bulletin board, in |
| 13 |   |   | all breakrooms, and in all other places where respondent typically posts |
| 14 |   |   | notices to its employees at its Tracy, California facility; maintain these |
| 15 |   |   | postings during the pendency of the Board's administrative proceedings |
| 16 |   |   | free from all obstructions and defacements; grant all employees free and |
| 17 |   |   | unrestricted access to said postings; and grant to agents of the Board |
| 18 |   |   | reasonable access to its Tracy, California worksite to monitor compliance |
| 19 |   |   | with this posting requirement; |
| 20 |   | (ii) | Distribute electronic copies of the Court's order setting forth the relief |
| 21 |   |   | granted, in English and in other languages as necessary to ensure effective |
| 22 |   |   | communication to respondent's employees as determined by the Board's |
| 23 |   |   | Regional Director of Region 20, said translations to be provided by |
| 24 |   |   | Respondent at respondent's expense and approved by the Regional |
| 25 |   |   | Director, to all employees at respondent's Tracy, California facility via |
| 26 |   |   | intranet or internet sites or apps that respondent uses to communicate with |
| 27 |   |   | employees; |

(d) **Within ten days** of the date this order is filed, convene one or more mandatory meetings, on working time and at times when respondent customarily holds employee meetings and scheduled to ensure the widest possible attendance, at respondent's Tracy, California facility, during which the following statement will be read to employees by a responsible official of respondent in the presence of a Board agent or, at respondent's option, by a Board agent in the presence of a responsible official of respondent:

> The United States District Court for the Eastern District of California recently granted a petition by the Regional Director of the National Labor Relations Board. The Regional Director showed she was likely to obtain a favorable ruling on a complaint she filed against UPS Supply Chain Solutions, Inc. In that complaint, the Regional Director alleges UPS violated the National Labor Relations Act:
>
> - First, by implicitly threatening employees that they might lose their jobs if they chose to be represented the Teamsters Local 439, International Brotherhood of Teamsters.
>
> - Second, by suspending and firing Daniel Valadez Arce because of his support for the Teamsters.
>
> The federal court did not make a final decision about whether UPS broke the law. UPS denies breaking the law. The Regional Director's complaint is still pending at the National Labor Relations Board. But because the Regional Director showed she was likely to succeed in the future, the federal court ordered UPS to do several things now, such as:
>
> - Reinstate Valadez on an interim basis;
>
> - Do not discipline or discharge employees for engaging in union activities; and
>
> - Do not threaten employees with a possible loss of work because they engaged in union activities.
>
> This is only a summary of the federal court's decision and order. You can find a full copy in the employee breakroom. You will also soon receive electronic copies, if you have not received electronic copies already.

19

|   |   |   |
|---|---|---|
| 1 |  | Respondent also shall afford the union, through the Regional Director, reasonable |
| 2 |  | notice and opportunity to have a representative present when the injunction order |
| 3 |  | is read to employees.  Interpreters shall be made available at respondent's expense |
| 4 |  | for any individual whose language of fluency is other than English.  Respondent |
| 5 |  | shall announce the meeting(s) for the injunction order reading in the same manner |
| 6 |  | it would customarily announce a meeting to employees; the meeting(s) shall be for |
| 7 |  | the above-stated purpose only.  Individuals unable to attend the meeting to which |
| 8 |  | they have been assigned will be able to attend a subsequent meeting during which |
| 9 |  | the same reading shall take place under the same conditions.  Respondent shall |
| 10 |  | allow all employees to attend these meetings without penalty or adverse |
| 11 |  | employment consequences, either financial or otherwise; and |
| 12 | (e) | **Within twenty-one days** of the date this order is filed, file with the court, with a |
| 13 |  | copy sent to the Regional Director for Region 20 of the Board, a sworn affidavit |
| 14 |  | from a responsible official of respondent setting forth with specificity the manner |
| 15 |  | in which respondent has complied with the terms of the court's decree, including |
| 16 |  | how and where the documents have been posted and distributed, as required by the |
| 17 |  | court's order. |

18  This order resolves ECF Nos. 1 and 2.

19  IT IS SO ORDERED.

20  DATED: January 3, 2024.

CHIEF UNITED STATES DISTRICT JUDGE